Charles HARRIOTT and James
Harriott, Appellants,

v.

Carlton O. TRONVOLD, Individually
and as Trustee of the Carlton O. Tronvold Trust, dated 9/29/92, Appellees.

No. 01–1547.

Supreme Court of Iowa.

Nov. 13, 2003.

Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellants.

Thomas D. Wolle of Moyer & Bergman, P.L.C., Cedar Rapids, for appellees.

LAVORATO, Chief Justice.

In this declaratory judgment action involving three shareholders of a closed corporation, two of the shareholders sued the third. The petition alleged breach of an oral contract to contribute to the corporation to cover cash shortfalls, breach of an oral contract to sell the assets of the corporation, and interference with contractual relations with the corporation.

The district court granted the defendants' motion for directed verdict on the first claim because the court determined there was insufficient evidence of the al-

leged contract. As to the second claim, the court concluded the evidence did not support the existence of a contract because there was no meeting of the minds. Finally, the court concluded the claim for interference with contractual relations was subject to an arbitration clause in a shareholders' agreement.

The plaintiffs appealed, we transferred the case to the court of appeals, and that court affirmed. We granted the plaintiffs' application for further review.

On our review, we affirm the decision of the court of appeals and the judgment of the district court regarding the claims for breach of contract to sell the assets of the corporation and interference with contractual relations. We vacate the court of appeals decision and reverse the judgment of the district court on the claim for breach of contract to contribute to the corporation to cover cash shortfalls. We remand the case for further proceedings consistent with this opinion.

## I. Scope of Review.

We recently summarized the rules governing our review of rulings granting motions for directed verdict:

Our review of rulings granting motions for directed verdict is for correction of errors at law. In our review, "we view the evidence in the same light as the district court to determine whether the evidence generated a jury question." We therefore view the evidence in the light most favorable to the party opposing the motion.... If reasonable minds could differ on an issue of fact, the issue is for the jury.

In ruling on such motions, the district court must decide whether the nonmoving party has presented substantial evidence on each element of the claim. "Evidence is substantial if a jury could

reasonably infer a fact from the evidence." A directed verdict is appropriate if the evidence is not substantial. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001) (citations omitted).

## II. Facts.

Viewing the evidence in the light most favorable to the plaintiffs, we think there was substantial evidence from which the jury could have found the following facts. On June 15, 1994, Carlton O. Tronvold, trustee of the Carlton O. Tronvold trust, filed articles of incorporation for Hitters, Inc. Tronvold transferred land near Cedar Rapids to the corporation in return for 1000 shares of stock. A sports complex was to be built on the land.

On July 15 Tronvold gifted 200 shares to Charles Harriott and 200 shares to James Harriott. Charles and James are brothers who had previously convinced Tronvold of the need for the sports complex. Following the transfer of the shares, Tronvold owned sixty percent of the issued stock and the two brothers each owned twenty percent. The three shareholders were named directors of the corporation, James was elected president, Tronvold was elected vice-president, and Charles was elected secretary/treasurer. Charles was hired to manage the facility.

At the same time of these events, the three shareholders executed a buy-sell agreement. In addition to the buy-sell provisions, the agreement included an arbitration clause that was to apply in "any dispute [that might] arise between one or more of the parties hereto, with respect to his or their rights, obligations, duties, or requirements under and by virtue of this agreement except as to the valuation of stock. . . ."

On July 18 the corporation borrowed $384,000 from Farmers State Bank for construction of the sports complex, which was to include softball diamonds, volleyball courts, and a concession building. In January 1995 the bank loan was increased to $484,000 to cover increased costs of the project.

In May 1995 the park opened for business. The corporation lost money the first year and for the following three years. In 1995, 1996, and 1997, the three shareholders contributed cash to the corporation in proportion to their ownership interests. Tronvold told the Harriotts that each shareholder would be responsible for contributing to the cash shortfall in proportion to his stock ownership and a failure to do so would work a forfeiture of the defaulting shareholder's interest in the corporation. The Harriotts agreed and contributed each time their share of the shortfall. Tronvold contributed the first three years but refused to do so for at least one year thereafter. The cash contributions were booked as equity, but no new shares were issued.

By the end of 1998, Tronvold's patience was wearing thin. At a shareholders' meeting, Tronvold insisted that the corporation hire a new manager and failing this, he would not contribute any more money. At about the same time, Tronvold met with the corporation's loan officer, James Mollenhauer. Tronvold told Mollenhauer that he was not willing to put any more money into the project unless the two brothers agreed to replace Charles with a new manager. Tronvold advised the loan officer that there was not enough cash to make the December payment in full and that his plan was to force the issue by letting the loan go into default. At the same time, Tronvold assured Mollenhauer that he would never let the bank take any losses on the loan.

At a January 1999 shareholders' meeting, Tronvold voted to remove Charles from the board and elected Vince Arioso in

his place. At the meeting, Tronvold put forward a proposal to sell the park to the City of Cedar Rapids or Kirkwood Community College. At the directors' meeting following the shareholders' meeting, Tronvold again expressed an unwillingness to contribute cash to the corporation. Although Charles was removed as a director, he remained as manager of the facility.

In February 1999 after the loan went into default, the Harriotts made an $8998.88 payment to cure the default. Although the park was losing money, the Harriotts decided to continue on, reasoning that they would minimize the loss they would otherwise experience if the park sat idle for the summer.

Things came to a head in the spring of 1999. At a special meeting of the board of directors on April 7, Arioso made a proposal to let the mortgage go in default, allow Tronvold to repurchase the property for the mortgage balance, and have the corporation file bankruptcy.

Later in the same meeting at which the parties' attorneys were present, Charles asked Tronvold if he were offered $500,000 would he sell? Tronvold replied that the City of Cedar Rapids and Kirkwood Community College declined to buy the park because neither had the money. Tronvold then said, "I think the park is worth more than $500,000, but to end this b … s …, yes, I would sell."

At this point, Tronvold's attorney called a time-out. The parties met separately with their respective attorneys after which Tronvold's attorney approached the Harriotts and their attorney and announced that Tronvold would not sell the ballpark. At trial, James testified that it was his understanding that the $500,000 for the ballpark included the debts and assets. James believed that no financing would be needed because he and Charles would just continue to make the mortgage payments

and have Tronvold removed from the loan. Following this meeting, the Harriotts continued to make the mortgage payments.

The Harriotts continued to operate the park in 2000. In October of that year, the parties met to discuss the treatment of cash contributions. Although Tronvold conceded that prior contributions had been treated as capital, he and Arioso voted to treat all contributions, including past contributions, as debt. The two then voted to terminate Charles' employment.

In early 2001 the parties again defaulted on the loan, at which point the Harriotts and Tronvold made payments to cure the default. The Harriotts continued to operate the ballpark over Tronvold's objections.

### III. Proceedings.

In November 1999 the Harriotts filed a declaratory judgment action naming Carlton O. Tronvold individually and as trustee of the Carlton O. Tronvold Trust (collectively Tronvold) and Hitters, Inc. as defendants. In an amended petition, the Harriotts alleged a count for declaratory relief, seeking a declaration of rights determining their rights as between themselves and Tronvold, and seeking specifically one of the following: (a) Tronvold should lose his equity position because he had failed to contribute to the cash shortfalls of the corporation; (b) The contribution by the Harriotts should be considered contributions resulting in the issuance of equity; or (c) The contribution of funds and services should be considered loans with appropriate judgments entered in favor of the Harriotts.

The petition also alleged a count for breach of contract for Tronvold's failure to sell to the Harriotts the assets of the corporation for the sum of $500,000. Finally, the petition alleged a count for inter-

ference with contractual relations because of Tronvold's interference with the Harriotts' contractual relations with the corporation.

The trial commenced in September 2001. Before trial, the parties stipulated that the corporation would agree to be bound by the court's determination about the classification of the corporate contributions, that is, whether the contributions would be classified as equity or debt. The parties proceeded to try the case to the jury, but the case never reached the jury because the district court granted Tronvold's motion for directed verdict on all of the Harriotts' claims.

Following the Harriotts' appeal, we transferred the case to the court of appeals, which affirmed. That court found that the evidence of the alleged oral contract to contribute to the corporation to make up for cash shortfalls was barred by Iowa Code section 622.32(2) (1999). That provision requires a writing in circumstances where one person promises to answer for the debt of another.

As to the breach of contract claim for the sale of the corporate assets, the court of appeals concluded that there was no meeting of the minds regarding an offer and acceptance.

Finally, as to the interference with contractual relations, the court of appeals determined that claim was waived. It was waived, the court held, because the Harriotts argued on appeal that Tronvold manifested bad faith rather than challenging the district court's finding that the arbitration clause in the shareholders' agreement barred the claim.

We granted the Harriotts' application for further review. We conclude the court of appeals correctly determined the claims for breach of the alleged contract for the sale of the corporate assets and interference with contractual relations. We therefore give those claims no further consideration.

## IV. Issues.

In his motion for directed verdict, Tronvold argued, as he does here, that for two reasons the Statute of Frauds barred evidence of the alleged oral contract to contribute to the corporation to cover cash shortfalls. First, the alleged contract was in actuality a contract to pay the debts of another. Second, the alleged contract was not capable of being performed within one year.

Tronvold objected during trial on the basis that the Statute of Frauds barred evidence of the alleged contract. The district court overruled the objection and allowed such evidence. Nevertheless, the court determined there was insufficient evidence to submit the claim to the jury and granted Tronvold's motion for directed verdict.

The court of appeals on the other hand determined that evidence of the alleged contract was barred by the Statute of Frauds.

We first consider the Statute of Frauds issue and then the sufficiency of the evidence issue.

## V. Statute of Frauds.

**A. The law generally.** Iowa's Statute of Frauds states in relevant part:

> Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by the party's authorized agent:
>
> . . . .
>
> 2. Those wherein one person promises to answer for the debt, default, or miscarriage of another, including prom-

ises by executors to pay the debt of the decedent from their own estate.

. . . .

4. Those that are not to be performed within one year from the making thereof.

Iowa Code § 622.32.

██ This statute does not render the oral promises mentioned invalid. Rather, the statute merely renders incompetent oral proof of such promises. For this reason, the statute is a rule of evidence and not of substantive law. The statute provides a defense, and the party asserting it must therefore raise it by answer or by objection to evidence at trial. *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 630 (Iowa 1996).

**B. Oral promise to answer for the debt of another.** As mentioned, Iowa Code section 622.32(2) bars evidence of an oral contract under which "one person promises to answer for the debt, default, or miscarriage of another." Iowa Code § 622.32(2). As one treatise has noted, "the Statute of Frauds has been confined to promises made to the creditor." 9 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 22:3, at 233 (4th ed.1999).

The Restatement of Contracts similarly provides that

[a] contract is not within the Statute of Frauds as a contract to answer for the duty of another unless the promisee is an obligee of the other's duty, the promisor is a surety for the other, and the promisee knows or has reason to know of the suretyship relation.

Restatement (Second) of Contracts § 112, at 292 (1981).

The Restatement explains the purposes underlying the Statute of Frauds:

In general the primary purpose of the Statute of Frauds is assumed to be evi-dentiary. In the case of suretyship contracts, however, the Statute also serves the cautionary function of guarding the promisor against ill-considered action. The suretyship provision is not limited to important or complex contracts, but is limited to suretyship and to promises made to an obligee of the principal obligation. Such promises serve a useful purpose, and the requirement of consideration is commonly met by the same promise or performance which is consideration for the principal obligation. But the motivation of the surety is often essentially gratuitous, his obligation depends on a contingency which may seem remote at the time of contracting, and natural formalities which often attend an extension of credit are likely not to provide reliable evidence of the existence and terms of the surety's undertaking. Hence the requirement of a writing. Reliance of the kinds usual in suretyship situations—extension of credit or forbearance to pursue the principal obligor—does not render the requirement inapplicable.

*Id.* cmt. *a*.

According to the Restatement of Contracts,

The word "duty" is used here as a substitute for the words "debt, default or miscarriages" used in the English statute to describe the principal obligation. Those words and corresponding words in the American statutes include all kinds of duties recognized by law, whether or not contractual and whether already incurred or to be incurred in the future. The person owing the duty is called the principal debtor or obligor. The duty may be conditional, voidable or unenforceable; *but if there is no duty at all, the Statute does not apply.*

*Id.* cmt. *b* (emphasis added).

██ As the Harriotts contend, this is not a suit by a creditor on a promise to the

creditor. Rather, this is a suit by shareholders of a corporation against another shareholder based on an alleged promise to contribute to the corporation to cover cash shortfalls. What is missing here is a promise by the Harriotts and Tronvold to a specific creditor of the corporation to pay a debt the corporation owes to the creditor. The alleged promise here is therefore not within the scope of section 622.32(2).

That brings us to Tronvold's alternative Statute of Frauds ground.

■ **C. Promises not to be performed within one year.** As also mentioned, section 622.32(4) bars evidence of oral contracts "that are not to be performed within one year from the making thereof." Iowa Code § 622.32(4). As we said in *Garland v. Branstad,*

> In deciding whether a particular oral contract is governed by [section 622.32(4)], the question is not whether performance must actually be completed within a year but whether it would be *possible* to perform the contract within that time frame. Put another way, "[c]ontracts of uncertain duration are simply excluded; the provision covers only those contracts whose performance cannot possibly be completed within a year."

648 N.W.2d 65, 71 (Iowa 2002) (quoting Restatement (Second) of Contracts § 130 cmt. *a*, at 328 (1981)). We therefore agree with the Harriotts that section 622.32(4) is narrowly applied to contracts that are not capable under any circumstances of being performed in one year. So the fact that an oral contract is performed over a period of time in excess of one year does not bar evidence of such a contract.

■ Here the alleged contract to contribute to the corporation to cover cash shortfalls was clearly one of uncertain duration. As the Harriotts point out, any contract that requires or contemplates future payments would not be performable within one year if those payments are in fact made. But the "impossibility" requirement necessarily recognizes such performance might occur in less than a year. For example, the parties could have sold the ballpark or done a number of things to prevent performance within one year.

We therefore conclude that neither provision of the Statute of Frauds barred evidence of the alleged contract to contribute to the corporation to cover cash shortfalls. The court of appeals erred in concluding otherwise.

**VI. Sufficiency of the Evidence.**

■ Because of the conclusion we reach as to the Statute of Frauds issue, we conclude the district court correctly allowed evidence of the alleged oral contract. However, the district court erred in concluding there was insufficient evidence to submit this issue to the jury. More specifically, there was sufficient evidence to submit to the jury the question whether Tronvold breached a contract with the Harriotts that if a shareholder failed to contribute to the cash shortfalls, in proportion to his ownership interest, his interest in the corporation would be forfeited.

Testimony from both brothers supports our conclusion that there was sufficient evidence to submit this issue to the jury. Charles testified as follows:

> Q. And what did Mr. Tronvold tell you was the situation in terms of having to put additional money in?
>
> . . . .
>
> A. In the original time and throughout the whole course of this, at the beginning, Carl—he secured the bank loan for us. It went—He was not going to carry us anymore, that this park needed capital or needed cash. It was all coming down to where I had put my

twenty percent up, Jim had to put his twenty percent up, and Carl had to put his sixty percent up. He was—As he stated, "I'm not going to have a problem putting my money up." He told us plenty of times, "You guys are going to be the ones having a problem. You have to make sure you can do this. That was the agreement."

Q. What did he tell you would happen if you didn't put up your share?

. . . .

A. If you don't put your money up, you are going to get out.

Q. Did you and your brother agree to that?

A. Yes.

Q. Now, in connection with that, did Mr. Tronvold ever tell you that he had been involved in other businesses that had similar arrangements?

A. Yes, he did.

Q. Tell us what he told you about the other business ventures.

A. It seemed around the time when we started putting the money in, the first call for having to put money into the corporation, he brought up a situation in Minnesota. I mean, he was involved in a land deal up there, and it was a three-partner situation again, and they all—If there was money to be put in, they all had to put it in, or they would lose their capital or lose their stock, however you want to put it. And finally two of the partners ran out of money, and he took over a hundred percent control of the land. It seemed like he used it as a scare tactic to us, so we always put our money into the deal.

Q. Did you always put your money into the deal?

A. Yes, we did.

James testified substantially the same as Charles. The record reflects that the two brothers always contributed to cover the cash shortfalls pursuant to the alleged contract. Tronvold, on the other hand, refused to contribute to cover the cash shortfalls for at least one year.

## VII. Disposition.

In sum, we conclude the court of appeals correctly decided the claims for breach of contract to sell the assets of the corporation and interference with contractual relations. We therefore affirm the court of appeals decision and the judgment of the district court on these claims.

We further conclude the Statute of Frauds did not bar evidence of the alleged oral contract to contribute to the corporation to cover cash shortfalls. We therefore vacate the court of appeals decision to the contrary. Although the district court correctly allowed evidence of the alleged oral contract, it nevertheless erred in concluding there was insufficient evidence to submit this issue to the jury. We therefore reverse the district court's ruling on this claim and remand the case for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART, VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

All justices concur except WIGGINS, J., who takes no part.