**Brad OLSON, Plaintiff,**

v.

**NEXTEL PARTNERS, INC., Defendant.**

No. 4:02–CV–90535.

United States District Court, S.D. Iowa, Central Division.

May 14, 2004.

Jon A. Vasey, Elverson Vasey & Peterson LLP, Des Moines, IA, Terrence D. Brown, Hixson Brown & Parrish-Sams PC, Clive, IA, for Plaintiff.

Roger T. Stetson, Michael R. Reck, Danielle M. Shelton, Belin Lamson McCormick Zumback & Flynn PC, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Before the Court is Defendant Nextel Partners, Inc. ("Nextel")'s motion for partial summary judgment. Plaintiff Brad Olson originally filed the present action in the Iowa District Court for Polk County, and Defendant removed the case to this Court based upon diversity of citizenship. In his Amended and Substituted Complaint, Plaintiff states two claims against Nextel for breach of an alleged oral employment contract and breach of the covenant of good faith and fair dealing. For reasons explained below, Defendant's motion is granted.

## I. BACKGROUND

Plaintiff Brad Olson is currently serving his second term as a member of the West Des Moines, Iowa City Council. In August of 1999, Plaintiff began working for Nextel, a business that sells cellular phones and cellular telephone service. Initially, Olson served as Nextel's general sales manager for Iowa, Nebraska and Wisconsin, and later a portion of the state of Illinois was added to his area of responsibility. Olson's original agreement with Nextel provided that he would be paid a base monthly salary of $7,916.66 with the potential to receive commissions, also referred to as bonuses, of up to $35,000 per year based on a variety of performance factors. Olson was also eligible to receive stock options, a benefit that was described in the Stock Option Agreement that Nextel provided to Olson on June 12, 2000.

On June 15, 2000, Perry Satterlee, an officer at Nextel, met with Olson to discuss issues related to his job performance which Nextel felt were impairing Olson's ability to effectively lead his team. Nextel claims that there had been reports of inappropriate conduct by Olson including

complaints that Olson consumed alcohol excessively and drank alcohol at work. Complaints regarding Olson's performance also noted that he socialized heavily with individual members of his team and on one occasion had made female employees uncomfortable by entertaining business associates at a strip club. As well, Nextel claims to have received reports that Plaintiff was dishonest, had repeatedly broken workplace promises, and was often absent and unavailable during normal work hours. Olson admitted that he had drank at work on at least one occasion, but he denied the other complaints. Nonetheless, Olson states that he made the changes Nextel requested at the June 15, 2000 meeting, and Olson claims that, until his September 18, 2000 meeting with Mark Fanning, Nextel's Vice President of People Development, no one from Nextel management expressed concern with his job performance.

The September 18, 2000 meeting is the origin of most of the disputes and claims in this lawsuit. The alleged content and characterization of the conversation that took place between Fanning and Olson during that meeting differs significantly between the parties. Olson contends that Fanning told him that his responsibilities were going to change and explained the terms and conditions of employment that were being offered to Olson as a result of that change. Olson claims that Fanning told him that he was no longer needed to run the Iowa, Nebraska, Wisconsin and Illinois teams, but that Nextel wanted him to stay on in a modified consultant position through the end of 2001. Plaintiff further claims that Nextel wanted Olson to issue a memorandum announcing his resignation that had been prepared by Nextel and dated September 19, 2000. According to Olson, Fanning insisted that Nextel would only agree to the offered employment package if Olson agreed to issue the memorandum. Olson claims that he reached a final, binding oral contract with Nextel during the September 18, 2000, conversation with Fanning.

According to Olson, in return for issuing the memorandum and making himself available as a consultant through the end of 2001, Nextel promised Olson the following as consideration:

a. Nextel would continue to pay Olson's full salary and commissions through the end of 2000, to include Illinois commissions;

b. Beginning January 1, 2001, Olson's base pay would adjust to $1000 per week for the year 2001;

c. Nextel would provide Olson with a cellular telephone account at no expense through the end of 2001;

d. Nextel would provide, at no cost to Olson, family medical insurance through the end of 2001; and

e. Olson would be paid for any unused vacation and sick leave accrued through the end of 2000.

During the meeting, the parties also discussed whether Olson would be entitled to the stock options that he had been granted in the 2001 Stock Option Agreement. Initially, Olson claimed that he entered into a final, binding contract during the discussion with Fanning on September 18, 2000, which included an agreement to allow him to accrue options for 2001. Olson retracted this statement, however, when Nextel produced a letter written by Olson on September 25, 2000, clearly indicating that Fanning did not agree to grant Olson the second set of 15, 000 shares that would have vested on December 31, 2001, had Olson worked through that date. Olson admits that a week later, on September 25, 2000, he sent a letter to Fanning stating, "I would like to have an agreement in principal [sic] by the next Monday." Olson further states in the letter, "[w]e appreciate your offer to vest year 1 (2000) but we

believe strongly that options in year 2 (2001) need to be included as part of our compromise."

Olson admits to having authored the September 25, 2000 letter and claims that his initial statement was an error, explaining that he was not given the opportunity to refresh his recollection by viewing the letter before testifying. Olson later testified that it was actually in telephone conversations with Fanning after September 25, 2000 when a final, binding agreement which guaranteed Olson the right to vest in an additional 15,000 options at the end of 2001 was reached. Olson, however, offers only his own insistence as evidence that an agreement was reached over the telephone. All correspondence appearing in the record before the Court indicates that Nextel consistently refused Olson's proffered terms of agreement regarding stock options for 2001.

Plaintiff states that he asked Fanning to reduce the terms of any agreement to writing at the September 18, 2000 meeting. Fanning allegedly replied that he would be willing to do so later, but he was reluctant to put anything into writing at the time because Nextel had additional employees leaving the company who were not being offered an employment package similar to the offer Nextel was extending to Olson. Olson later sent Fanning additional requests to put the agreement in writing, but those requests were never met.

In contrast to Plaintiff's version of events, Nextel contends that the purpose of the September 18, 2000 meeting with Olson was to inform him that he would be removed from Nextel's employ. Nextel does not dispute that there were discussions about allowing Olson to remain employed in a different capacity. Defendant states that the company was concerned with facilitating a smooth transition in a market that was struggling and wanted to allow Olson the opportunity to exit gracefully. Nextel was also mindful of Olson's oft stated influence over the West Des Moines City Council. Nextel claims that because of these concerns, Fanning offered Olson a retainer/consulting arrangement, under which Nextel would continue paying Olson after his employment ended despite the fact that he would not actually be working. Nextel maintains, however, that Fanning never entered into an employment contract of any kind with Olson, much less did he promise Olson that he would be employed through the end of 2001. Nextel claims that the parts of the September 18 discussion that Olson had interpreted as his end of the contract (sending the resignation memorandum and encouraging existing and potential customers of Nextel to do business with Nextel) were merely expressions of what Nextel hoped and intended to occur.

The parties agree that Plaintiff's severance period was to begin the first week of January 2001 at which time Olson's salary was to be altered to one thousand dollars a week. The parties disagree, however, on the agreed upon date of termination. On December 27, 2000, prior to the start of the severance period, Fanning confirmed via e-mail his understanding of Nextel's intentions. Fanning reiterated what he claims he had told Olson earlier—that Olson would continue to be paid and to accrue stock options only through December 15, 2001. After Mr. Fanning conveyed Nextel's position that stock options would accrue only for 2000 and his pay would continue only through December 15, 2001, Olson responded that he felt that December 30, 2001 was the appropriate termination date.

On January 3, 2001, Olson responded that the parties agreed in September that his employment would continue through December 30, 2001. On February 22, 2001, Olson emailed Mr. Fanning, now

claiming that the termination date should be January 2, 2002. Fanning replied again that Olson's employment with the company would end on December 15, 2001, and that there would be no additional vesting of stock options. Nextel claims that they heard nothing further from Olson and that he continued to accept checks from Nextel until his ultimate and eventual termination on December 28, 2001—still short of the December 31, 2001 date on which year 2001 options would vest.

Although Nextel refused to grant Plaintiff any additional stock options in 2001, Olson was not without any stock options. For the year 2000, Olson accrued 15,000 stock options. There is no dispute that these options vested and were accessible through E–Trade. To exercise the options though, Nextel informed all participants in its stock option plan, including Olson, that participants first had to activate their accounts with E–Trade. E–Trade also informed all participants in Olson's plan that they had to activate their accounts. Plaintiff states that he did not realize that he had to activate his account because the notice from E–Trade came via email, and Olson does not read form letters. Olson also testified that, despite the email reminders from Nextel stressing the importance of the activation process, Olson believed that Nextel would do this for him because he had received email from Nextel which assured him that Nextel would do its part in making certain that his account was activated.

Olson does admit that he knew he had only ninety days to exercise his options after his employment with Nextel ended on December 28, 2001 but that he did not take the necessary steps to activate his E–Trade account until the last possible day. When Olson finally called E–Trade on March 28, 2002, the last possible day to exercise his options, Joseph Siders, the E–Trade representative with whom Olson spoke, informed him that his account had not yet been activated and that this process usually took three days. E–Trade, nonetheless, indicated that it would try to activate his account on that same day. As Siders and Olson attempted to make arrangements for Olson to activate his account, Olson informed E–Trade that he was flying to Arizona that day and would be difficult to reach.

Although he was traveling Olson was able to provide Siders with a fax number where he could be reached, and E–Trade sent Plaintiff an account activation form as the first step in the activation process. E–Trade received Olson's completed activation form at 3:32 p.m., a mere twenty-eight minutes before the market closed for the day. Olson called E–Trade back at 5:21 p.m. to find out if the options had been exercised. During this thirty-four minute call, Olson maintains that an unidentified E–Trade representative told him that an unidentified Nextel representative had blocked Olson's ability to exercise his options. To date, however, Olson has not produced any evidence of this conversation other than his own statement and a telephone record indicating that he placed a thirty four minute phone call to E–Trade on March 28, 2002.

Plaintiff claims that on the evening of March 28, 2002 he was contacted by Mr. Manning, General Counsel for Nextel, who allegedly informed Olson that Nextel had held up the exercise of his options. Olson claims that Manning informed him that if he agreed to sign a release for any and all causes of action against Nextel, the company would allow the options to be exercised on the next trading day. Olson said he refused this offer because he believed that he was still owed commissions, vacation and sick pay and another 15, 0000 options. The next day, Mr. Manning sent an email to Olson withdrawing Nextel's March 28,

2002 offer to extend the trading period for Olson to exercise his options. The email, however, makes no reference to any Nextel interference with Olson's attempt to exercise his options.

Olson claims that he has not been able to verify the contents of his thirty four minute telephone call with the E–Trade representative because E–Trade has no recording of the conversation. Olson states that the only possibility that currently exists to obtain evidence in support of his claims regarding the thirty four minute phone conversation would be to depose the relevant E–Trade employees. Olson says that his counsel missed the deadline to notice these out-of-state witnesses because E–Trade only recently verified in writing that it is unable to locate that telephone call. Because of this, Plaintiff's counsel stated that he would move for a continuance of this matter so that depositions can be taken. To date, no such motion has been filed.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

## III. DISCUSSION

The parties, and now the Court, have spent considerable time and effort attempting to delineate and review the specific terms of an alleged oral employment contract Plaintiff claims to have entered into with Defendant in September of 2000. In so doing, some of the most basic facts of this case have been largely obscured by the details. Before proceeding further,

the Court finds it beneficial to review these facts.

Plaintiff's Amended and Substituted Complaint essentially states one claim against Defendant; Nextel breached an oral employment contract entered into after Plaintiff was forced to resign in September of 2000.[1] The parties argue about whether the alleged agreement was an employment contract, a severance agreement, or, a consulting employment agreement, but the result is the same. Assuming arguendo that events unfolded exactly as Plaintiff has described, Olson and Nextel entered into an oral contract, the terms of which are detailed above, which was to commence on September 19, 2000 and terminate on January 2, 2002 when Plaintiff's stock options for 2001 were to have vested. Thus, under Plaintiff's version of the facts, the alleged oral contract absolutely could not be performed for more than fifteen months.

## A. Statute of Frauds

In relevant part, Iowa Code § 622.32 states:

> Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by the party's authorized agent:
>
> 4. Those that are not to be performed within one year from the making thereof.

■ The Iowa statute of frauds does not render oral promises invalid. Rather, the statute is a rule of evidence that renders incompetent oral proof of such promises. *Harriott v. Tronvold*, 671 N.W.2d 417, 422 (Iowa 2003). Defendant contends that Iowa Code § 622.32(4) applies in the pres-

ent case as the alleged oral employment contract could not have been performed within one year of its making. The Court agrees. As the Iowa Supreme Court has explained:

> In deciding whether a particular oral contract is governed by [section 622.32(4)], the question is not whether performance must actually be completed within a year but whether it would be possible to perform the contract within that time frame. Put another way, "contracts of uncertain duration are simply excluded; the provision covers only those contracts whose performance cannot possibly be completed within a year."

*Harriott*, 671 N.W.2d at 423 (quoting *Garland v. Branstad*, 648 N.W.2d 65, 71 (Iowa 2002) (quoting Restatement (Second) of Contracts § 130 cmt. a, at 328 (1981))).

In the present case, there is no set of circumstances under which the alleged contract could have been performed within one year. Given either party's version of events, Plaintiff's employment was to continue until December 15th or 30th, 2001 or January 2, 2002. As well, Plaintiff contends that he was to receive an additional 15,000 stock options at the end of 2001. As options for 2001 could not vest until 2002, it is utterly impossible for the contract alleged by Plaintiff to have been performed within one year of its making.

■ Plaintiff contends that the Court should find that the doctrine of partial performance exception to the statute of frauds as stated in Iowa Code § 622.33 should apply to the present case. By its very terms, § 622.33 is limited to real estate contracts. *See Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567

---

1. Plaintiff's Amended and Substituted Complaint also states a claim against Nextel for breach of the covenant of good faith and fair dealing. Plaintiff's allegations regarding this claim, however, simply repeat his previous allegations regarding Defendant's alleged breach of contract.

N.W.2d 405, 407 (Iowa 1997); Iowa Code § 622.33. Furthermore, there is no comparable statutory exception for contracts not to be performed within one year. *Id.* at 408.

■ Olson relies on a case from Iowa's Court of Appeals, *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162 (Iowa Ct.App.1993), in arguing that the application of the doctrine of partial performance as an exception to the statute of frauds is not limited to real estate. In *Pollmann*, however, the Iowa Supreme Court expressly disapproved of *Netteland*. *See Pollmann*, 567 N.W.2d. at 407–409 (quoting *Corbin on Contracts* § 459, at 231 (Supp.1997) (criticizing Netteland, saying "if the statute of frauds means anything, surely this case ought not to have gone to the jury")). As this Court's obligation is not to follow the ruling of an intermediate court but rather to apply state law as interpreted by the State's highest court, *Cassello v. Allegiant Bank*, 288 F.3d 339, 340–41 (8th Cir.2002), Plaintiff's reliance on a case by the Iowa Court of Appeals that was not endorsed by the supreme court is misplaced.

■ In *Pollmann*, however, the supreme court stopped short of answering the legal question of whether the partial or full performance exceptions apply to oral employment contracts. *Pollmann*, 567 N.W.2d at 408. Rather, the court went on to consider whether there was substantial evidence of partial performance such that the exception could apply. In considering the question, the court in *Pollmann* reasoned, the doctrine of partial performance is restricted to circumstances in which "the acts constituting partial performance are referable exclusively and unequivocally to the contract." *Pollmann*, 567 N.W.2d at 409. Restated, "if the acts claimed as part performance can be explained without reference to the alleged oral contract, they do not take the contract out of the statute of frauds." *Id.* (citing *Davis v. Davis*, 261 Iowa 992, 156 N.W.2d 870, 877 (Iowa 1968)).

■ Here, as in *Pollmann*, Plaintiff's actions can easily be explained without reference to the oral contract. Nothing involved with making oneself available as a consultant and accepting checks for so doing requires the existence of a contract. Instead, these actions are perfectly consistent with an at will employment situation. Either party could have ended the relationship at any time, and neither party's role was dependant upon a contract. As such, the Court finds that Plaintiff has not produced evidence showing that his actions are referable exclusively and unequivocally to the alleged oral contract. An exception to the statute of frauds for partial or full performance, therefore, cannot apply.

■ As the alleged oral contract could not have been performed within one year, and Plaintiff has not produced substantial evidence that his actions were referable exclusively and unequivocally to the alleged oral contract, the Court finds that the alleged oral contract between Olson and Nextel falls under the ambit of Iowa Code § 622.32(4). Hence, any evidence other than a written and signed agreement is rendered incompetent to prove the existence and terms of the agreement. Plaintiff admits that the agreement was never reduced to writing, and Plaintiff cannot, therefore, meet his burden of proving the existence or terms of an employment contract with Nextel. Defendant is, therefore, entitled to summary judgment on Plaintiff's claim for breach of contract. Moreover, Plaintiff's second claim for breach of the covenant of good faith and fair dealing must also fail as such a claim relies first on the existence of a contract. Defendant's motion is therefore granted.

## IV. ORDER

Defendant's Motion for Summary Judgment is **granted** on all claims. Plaintiff's Complaint is hereby dismissed with prejudice.

IT IS SO ORDERED.