142 N.W.2d 541 (1966)
In the Matter of the ESTATES of Clara E. KOCH and Arthur L. Koch.
Elmer KOCH and Lucille Koch, Appellants,
v.
Clarence W. GOFF, Administrator-with-Will-Annexed, Appellee.
No. 52027.
Supreme Court of Iowa.
May 3, 1966.
*542 Bailey C. Webber, Ottumwa, for appellants.
Livingston, Day & Bates, and E. D. Morrison, Jr., Washington, for appellee.
LARSON, Justice.
This is a second appeal from a verdict and judgment in favor of defendant-administrator *543 on claimants' joint claim against the estates of Clara E. Koch and Arthur L. Koch based upon a verified acknowledgment of debt. In re Koch's Estate, 256 Iowa 396, 127 N.W.2d 571.
In the prior action, affirmed in part and reversed in part, we held the verified acknowledgment of debt executed and delivered to Elmer and Lucille Koch by Arthur L. and Clara E. Koch on April 22, 1959, stating an amount growing out of past transactions of specified nature and providing that payment be made without formal proof or itemization was an account stated, and not just an admission in writing reviving a cause of action contemplated under section 614.11, Code of Iowa, 1962.
Prior to retrial claimants amended their claim as follows:
"1. On April 22, 1959, decedents Clara E. Koch and Arthur L. Koch made, executed and delivered to these claimants their written acknowledgment of debt, stating the account of indebtedness owed by the decedents to claimants in words and figures as follows:
"We, Arthur L. Koch and Mrs. Clara E. Koch, husband and wife, of Washington County, Iowa, hereby acknowledge that we are indebted to Elmer Koch and Lucille Koch in the sum of $24,620.22, for money advanced and loaned to buy real estate, for money advanced and loaned to buy and feed livestock, for money paid and advanced in the payment of bills in connection with the general operation of our farms, for money paid and advanced to build a garage, to remodel a house, for building a tenant house, for repairing buildings, for fencing material furnished, for bulldozing, for seed, for fertilizer, for limestone and otherwise, all in connection with farm properties owned by us, and said amount shall be paid to the said Elmer Koch and Lucille Koch without the necessity of formal proof or itemization and, if not sooner paid, shall be allowed as a claim against the estate of either or both of us.
"Dated at Brighton, Iowa, on this 22nd day of April, A.D., 1959.
 /s/ Arthur L. Koch
 /s/ Mrs. Clara E. Koch
"Subscribed and sworn to before me on this 22nd day of April, A.D., 1959.
 /s/ Lee Emry
 Notary Public in and for
 Washington County, Iowa
"2. No portion of said debt as stated and acknowledged was paid by decedents or either of them.
"3. Claimants are the owners and holders of said debt, as stated and acknowledged.
"4. Claimants withdraw Count II of their claim heretofore filed."
An appropriate prayer for relief followed.
Defendant-administrator filed his answer, pleading several special defenses as required in section 635.57 of the Code, and a counterclaim consisting of thirteen divisions. Answer thereto was filed and the matter proceeded to trial. Claimants offered the verified debt acknowledgment, marked Exhibit P-1, in evidence, and upon its admission rested. Defendant then offered evidence on the pleaded special defenses of fraud and misrepresentation, undue influence and mistake, mental incompetence, and lack of consideration, and on his counterclaim against the claimant Elmer Koch. Pursuant to claimants' rebuttal evidence, the court submitted the issues as to special defenses and a counterclaim relating to an alleged sale of 1200 bushels of corn from Arthur to Elmer in April, 1952.
The jury returned a verdict adverse to appellants' joint claim, based on Exhibit P-1, and for the administrator on his counterclaim under Division VIII in the sum of $1,145.00.
*544 Four errors are relied upon for reversal: (1) The court erred in failing to sustain claimants' motion for verdict in their favor in respect to the claim based on Exhibit P-1. (2) The court erred in not sustaining Elmer Koch's motion for directed verdict as to Division VIII of the counterclaim. (3) The court erred in overruling paragraphs 1, 2, and 3 of claimants' motion for judgment notwithstanding the verdict. (4) The court erred in failing to give claimants' Requested Instruction No. 3, and in giving Instruction No. 6 over timely objections by counsel for claimants. We shall consider them in that order.
I. There is no serious dispute as to the law involved. As is so often the case in matters of this kind, the law is not troublesome. It is its application to the facts revealed that causes difficulty for the courts. Thus, the problem presented in this division is whether the documentary evidence in the record and all the testimony produced by the administrator, considered in a light most favorable to him, generated a jury question on the issues presented. We think it did, and that the trial court was correct in submitting them to the jury.
The burden to establish pleaded special defenses such as fraud, mistake, mental incompetence, and undue influence, and a lack of consideration, like other affirmatively-alleged matters, is upon one who pleads them. In re Estate of Kneebs, 246 Iowa 1053, 70 N.W.2d 539. In cases of this kind it is defendant's duty to establish fraud, mistake, mental incompetence, or undue influence, and a defense of lack of consideration by a preponderance of the evidence. Kohlstedt v. Farm Bureau Mutual Ins. Co., Iowa, 139 N.W.2d 184, 185. In re Koch's Estate, supra, and citations; Bixby v. Carskaddon, 55 Iowa 533, 8 N.W. 354; Ley v. Metropolitan Life Ins. Co., 120 Iowa 203, 94 N.W. 568, and cases cited.
Considerable evidence, documentary and testamentary, was offered by defendant over a wide period of time in an effort to establish his defenses, such as dominance, influence, and the financial relationship between the parties. While the record is long, we shall attempt to summarize the evidence we believe sustains our conclusion. In the prior trial at page 576 of 127 N.W.2d, we considered claimants' objections to the relevancy or materiality of such evidence and quoted with approval from Ipsen v. Ruess, 241 Iowa 730, 734, 41 N.W.2d 658, that the guide to be used in determining relevancy was "whether there is a logical or rational connection between the fact which is sought to be proved and a matter of fact which has been made an issue in the case." We then went on to say, "in the instant case * * * the issues are both numerous and complex. * * * The whole relationship between the parties became important." Since the evidence was about the same in each case, we now give special consideration to whether the quality of the evidence of fraud, undue influence, and mental incompetence, was sufficient for jury consideration, and whether the evidence of lack of consideration would support a finding in defendant's favor on that issue.
Obviously, close attention is given to both the quantity and the quality of the evidentiary proof. While proof of fraud, mistake, undue influence, or mental incompetency, would not necessarily be the same, due to their relation, evidence as to one might well affect the others. For instance, many factors may enter into the claimed exercise of undue influence upon the minds of a person to secure the signing of a document which would not be signed except for such influences, and fraud requires another element beyond undue influence. Family relationship, physical and mental health of the signer, opportunity and disposition to influence and dominate, and dependency, are but a few of these common elements. The court here referred to them in Instruction No. 6, of which appellants complain and to which we will later refer.
*545 Appellants contend the evidence shows no more than proper consideration, help, and kindness toward the decedents, but appellee contends the record, taken as a whole, discloses a continuous pattern of domination and influence designed to serve the personal interests of the appellants Elmer and Lucille Koch and contrary to the best and natural interests of Arthur and Clara Koch. We turn then to the record.
It appears the decedents were frugal and hard-working farm folks, had accumulated three farms, the home place where they lived of 160 acres, a north farm of 160 acres, and an east farm of 240 acres. They had three sons, Glenn, Howard, and Elmer. They contemplated leaving a farm to each son, and Howard was permitted to buy 80 acres off the east farm for $4,000.00 less than its value because the remaining 160 acres was worth $4,000.00 less than the other two farms. In 1950 as Arthur and Clara neared retirement, they executed wills devising the north farm to Elmer, the home farm to Glenn, and the remainder of the east farm to Howard. This will recited these lands had been rented to the sons and that final settlement for rentals had not been made, that the indebtedness due from each was to be charged against his share.
Glenn Koch died March 23, 1956, and on April 19, 1957, Arthur and Clara, accompanied by Elmer and Lucille Koch, appeared at the A. E. Baldrige law office in Washington, Iowa, where new wills were drawn and executed by Arthur and Clara. These wills provided that Howard should have the east farm, Elmer the home farm and a $5,000.00 legacy, and the remainder equally divided between them. There was no explanation of the $5,000.00 bequest to Elmer.
Later on July 8, 1957, Arthur and Clara came to the Baldrige office with Clara's brother, Homer Pfeiffer. They were out of funds, had not been collecting rent for the two farms rented to Elmer and one to Howard. Mr. Baldrige prepared a declaration of trust which appointed Mr. Pfeiffer trustee and conveyed their real estate to him. Arthur and Clara signed it, and Mr. Baldrige acting as the trustee's lawyer, attempted to collect the back rents due them. He testified Emer told him he had nothing with which to pay unpaid rents, that he had not been raising crops and could not pay rent due his parents. No back rent was collected by the trustee from Elmer at any time. A compromise settlement with Howard was made and $1,536.00 was received from him. Howard paid rent for the east land continuously thereafter. Being unable to collect from Elmer, on October 10, 1957, a notice of termination of farm tenancy was served by the trustee on Elmer and his wife for nonpayment of rent. A few days later on October 22 Elmer gave the trustee two notes in the amounts of $375.00 and $1,000.00 in payment of the 1957 rent. They remain unpaid and are the subject of the counterclaim in Divisions I and II herein. It is to be noted that in his conversations with the trustee's attorney, Mr. Baldrige, Elmer made no claim of any indebtedness due him from his father or mother, and the trustee was forced to borrow $5,000.00 to provide for the needs of Arthur and Clara.
On March 27, 1958, Elmer and the trustee entered into a new lease for the crop year of 1958 at the Baldrige office. On the same day it appears Arthur and Clara, with Elmer and Lucille, came to Gifford Morrison, another Washington attorney, and inquired about revoking the trust. It also appears Mr. Morrison's records of office conferences disclosed no prior conferences with Arthur and Clara, but at least one prior conference with Elmer and Lucille on March 19, 1958. As a result of the March 27th conference, new wills were drawn for and executed by Arthur and Clara, and a notice of revocation of trust was prepared and delivered to Mr. Baldrige. On the same date Lucille Koch attempted to get the original wills from Mr. Baldrige, but did not succeed.
*546 Mr. Morrison's office records further show that while negotiations were proceeding with Mr. Baldrige concerning the attempted revocation of trust, several conferences were had with Elmer and Lucille, but none with Arthur or Clara until April 22, 1958.
As a result of the negotiations, an application to the court was made by the trustee of the private trust to assume jurisdiction thereof and to enjoin Elmer Koch from interfering with the administration of the trust. By mutual agreement of counsel on June 12, 1958, the court assumed jurisdiction of the trust, cancelled the attempted revocation, and appointed Mr. Jungbluth as successor trustee. Thereafter Mr. Morrison represented the trustee, but had no better success than his predecessor in collecting rent from Elmer.
About this time Clara Koch had two light strokes, and on April 20, 1958, Elmer and his family moved from the north farm, to which he had attempted to add improvements, to the home farm where they lived with Arthur and Clara. Shortly thereafter Clara suffered a rather severe stroke and required medical care as well as the nursing services of Lucille. Dr. Wolfe, the family doctor, was a witness for defendant.
It further appears Elmer tried to rent the north farm for the crop year 1959 on a grain-share-rent with an option to buy, but the new trustee leased both the north farm and the home farm to another for $5,000.00 cash rent.
On or about October 28, 1958, Elmer and Lucille borrowed from Arthur $1,650.00, which had been obtained as a loan from life insurance on Arthur's policy, and on February 5, 1959, an application was filed in the trust to pay Lucille $8,400.00 for services rendered Arthur and Clara. After hearing, this application, filed by Bray & McCoy, of Oskaloosa, Iowa, was dismissed on March 12, 1959. Mr. Morrison testified both Arthur and Clara told him they did not hire Tom Bray, but Mrs. Sabin said that at the request of Lucille she drove Arthur and Clara to Mr. Bray's office in the spring of 1959. In any event, on February 27, 1959, Mr. Bray prepared new wills for decedents which gave all their property to Elmer and Lucille Koch.
In the meantime, on February 2, 3, 5, and 20, 1959, Elmer and Lucille had consulted still another attorney, Eugene McCoid, of Mount Pleasant, Iowa. He had never met Arthur or Clara, but did draft the instrument Exhibit P-1 in blank for later execution. On April 22, 1959, after Elmer, Arthur, and Clara had gone over many checks written on Elmer's account for some years prior, Arthur and Clara agreed these were sums paid on their behalf and Elmer should be allowed them as a just debt. Lucille called Lee Emry, of Brighton, Iowa, who came to the farm, added the prepared list on his adding machine, and when Arthur and Clara said they wanted the amount inserted in the P-1 form, he filled in the total, took their acknowledgments, and left. Elmer was not present during this time, and Lucille was working in the kitchen.
On March 27, 1959, codicils which readopted the Morrison wills dated one year earlier were signed by Arthur and Clara, nullifying the wills drawn by Mr. Bray a month earlier.
On May 19, 1959, Mr. Bray filed another application for removal of the trustee in the name of Arthur and Clara Koch. On July 8, 1959, Clara's deposition was taken, and a mere reading thereof demonstrates her confusion and disorientation. She did not even know the number of acres in their farms. A few days later, on July 24, 1959, she suffered a more serious stroke, was taken to a Fairfield hospital, where she died December 14, 1959.
Elmer filed a petition for probate of Clara's will dated February 27, 1959, although there was a codicil of March 27, 1959, reinstating the prior will available. Arthur died February 29, 1960, and both estates were probated together. Here again
*547 Elmer filed the will of February 27, 1959, giving all the property to Elmer and Lucille, but when a will contest developed, the codicils and wills of March 27, 1958, giving the east farm to Howard, the home farm to Elmer, and dividing the remainder between them, were filed, and the will contest was not tried. These wills were then admitted to probate and Clarence W. Goff was appointed administrator-with-will-annexed. He qualified November 10, 1960, and on May 4, 1961, Elmer and Lucille filed the claim which resulted in these proceedings.
Dr. Wolfe, called on behalf of defendant, testified that Clara's mental acuity was decreased and she had advanced signs of senility from July 10, 1958, to the time of her death, that she was incapable of comprehending and understanding any legal document, that she would be subject to the influence of persons with her and "was like a child to Lucille", depending on her for everything, including making business decisions.
The doctor further testified that in his opinion Arthur's mind was beyond the mental competency required to comprehend a legal document or to do legal business during this period of time, that he also was subject to the influence of Lucille, and that she was capable of influencing him, doing so in the doctor's presence when he had minor surgery.
There were other circumstances, but we have related sufficient to reveal the actions of the parties over the period involved and at the time Exhibit P-1 was executed. While there is little or no direct evidence of the exercise of undue influence, such may be inferred from the facts and circumstances proven. In re Estate of Farlow, 243 Iowa 15, 50 N.W.2d 561. Therein the court stated at page 16 of 243 Iowa, at page 561 of 50 N.W.2d: "There is no direct evidence the will was the product of undue influence exercised at the time it was made. However, we have said many times undue influence may be, and usually is, proven by circumstantial evidence. Direct proof is seldom available. See In re Estate of Telsrow, supra, 237 Iowa 672, 677, 22 N.W. 2d 792, 796, and citations; In re Estate of Ankeny, 238 Iowa 754, 760, 28 N.W.2d 414, 417; In re Estate of Rogers' Estate, 242 Iowa 627, 635, 47 N.W.2d 818, 823, and citations." (Emphasis supplied.)
On the issue of consideration there was additional evidence that Elmer Koch had owned a farm east of Brighton from 1950 to 1957, that some of the checks listed in computing P-1 could have been for expenses incurred on that farm, that some of the checks listed were for livestock and grain Elmer had previously claimed as his own, and that there were many checks listed for work done on the north farm where Elmer lived at the time under lease from his parents, and upon which he paid no rent.
II It is perhaps true there was little, if any, direct evidence to sustain defendant's special defenses, but, as stated, defenses such as fraud and undue influence may be and usually are proven by circumstantial evidence. In re Estate of Farlow, supra, 243 Iowa 15, 50 N.W.2d 561, and citations; In re Estate of Carpenter, 232 Iowa 919, 927, 5 N.W.2d 175. We have carefully considered the evidence and are convinced the issues raised by defendant could not be determined as a matter of law, that there was substantial evidence from which strong inferences could arise in support of the alleged defenses, and that these issues required the trial court to submit them to the jury under proper instructions. We, therefore, hold the court committed no error in overruling plaintiffs' motions or directed verdict in their favor.
The nub of this case, of course, is whether there was substantial evidence of fraud, misrepresentation, and undue influence being exercised by claimants upon Arthur and Clara when the instrument P-1 was executed, whether at that time Arthur *548 and Clara were mentally incompetent and the items listed to make up Exhibit P-1, all introduced in evidence were obligations of Arthur and Clara, and whether this evidence met the test required by law and showed claimants at that time did dominate the old folks in such a way as to obtain acknowledgment of an unjustified claim. There is other evidence of such domination in addition to that referred to above, but we deem it unnecessary to relate further incidents. While it is true fraud and undue influence will not be presumed and existence of such must be established by clear and satisfactory evidence (Ley v. Metropolitan Life Ins. Co., supra, 120 Iowa 203, 94 N.W. 568, and citations, Leonard v. Leonard, 234 Iowa 421, 12 N.W.2d 899, Stephenson v. Stephenson, 247 Iowa 785, 74 N.W.2d 679), and while this may be a borderline case, we note that two juries and two judges have heard this evidence and found there was evidence sufficient to justify a denial of the claim P-1. We believe the evidence here is more substantial than that in the above-named cases, and while there is testimony that claimants were merely being considerate of the parents' welfare and needs and no attempts were made to dominate them, yet the jury had the right to draw its own conclusion as to the object and purpose of claimants' actions, largely undisputed in the record. In re Estate of Rogers, 242 Iowa 627, 631, 47 N.W.2d 818, 820. Here, as appellants admit, there was direct evidence of mental incompetency and weakness, which, when connected with strong circumstantial evidence of direction and dominance, convinces us we should not interfere with the verdict. It is clear claimants had opportunity and disposition to exercise influence at the time this acknowledgment of debt was secured, and the circumstances at or about that time justify a finding that they did so. In re Estate of Farlow, supra, 243 Iowa 15, 20-21, 50 N.W.2d 561, and citations. We pointed out therein that, although many of the incidents referred to in the evidence may seem trivial, the combined effect of the proven circumstances was such as to make the issues raised for the jury. Applicable here is the court's statement that "From the whole record the finding is warranted that proponent waged an aggressive campaign from the start to get testator's property into her own name and to procure this unjust and unnatural will which was really her will, not his." Inferentially at least, it could be found claimants were conducting a campaign to get an unjust and unnatural distribution of the property by way of questionable debt acknowledgment and by will, to cut out the just share of brother Howard.
III. Next appellants claim the court erred in failing to direct a verdict in their favor on appellee's counterclaim, set out in Division VIII, for 1200 bushels of corn allegedly sold and delivered to Elmer. They contend the only evidence produced as to the sale of this corn from Arthur to Elmer was the testimony of Howard Koch, who said he delivered the corn to Arthur and saw Elmer feeding it to his own livestock, and that this evidence was insufficient to carry the administrator's burden to show that sale was not included in the account stated in Exhibit P-1. We do not agree. The trial court in its instruction properly told the jury that in order to recover on this claim it would be necessary for the administrator to establish by a preponderance of the evidence that the corn was furnished Elmer and that the obligation to pay for it was either not included in Exhibit P-1 or that P-1 was invalid.
It is well established that an account stated extends only to those transactions contemplated and intended by the parties, and the burden of proof is upon the party seeking to establish the item claimed was not to be included. In re Estate of Kneebs, supra, 246 Iowa 1053, 70 N.W.2d 539. In event the account stated is set aside for fraud or mistake, it is unnecessary to make a further showing that the items claimed were not included in the void instrument. In re Koch's Estate, supra, 256 Iowa 396, 127 N.W.2d 571, 575.
*549 Here, the question of whether Elmer purchased the corn from Arthur was proper for the jury. This item was not among the items listed to make up P-1, and the jury found P-1 was invalid. There was no error in this assignment.
IV. Error is also assigned for the court's failure to sustain claimants' motion for judgment notwithstanding the verdict and overruling their paragraphs 1, 2 and 3 thereof. It is urged this error rests on the propositions that (a) the special findings of the jury determined that defendant-administrator had not sustained the burden of proof of his special defense on fraud and misrepresentation and mental incompetence; (b) on the record, Exhibit P-1 as a matter of law was supported by lawful consideration; and (c) there was insufficient testimony and evidence that was of clear, satisfactory and convincing character to sustain the jury's answer unanimously finding undue influence. In the previous divisions we have decided all of these questions adverse to appellants.
However, when submitting these issues to the jury, the trial court also submitted four substituted special interrogatories. In addition to the general verdict against claimants as to Exhibit P-1, the jury, in answering the interrogatories, found unanimously that P-1 was executed as a result of undue influence exercised by Elmer and Lucille Koch and that there was no consideration for the execution of Exhibit P-1. It failed to find unanimously mental incompetency of Arthur and Clara at the time of the execution of P-1 or that it was executed as a result of fraud.
Contention is made by appellants that the answers to the later interrogatories were inconsistent with the general verdict, that there was insufficient evidence to sustain the answer as to undue influence, and that as a matter of law sufficient consideration had been shown to sustain Exhibit P-1. They cite R.C.P. 206, Ipsen v. Ruess, supra, 241 Iowa 730, 41 N.W.2d 658; Jolly v. Doolittle, 169 Iowa 658, 149 N.W. 890, and other cases in support of their contention that their motions to direct should have been sustained. We do not find them helpful or applicable to the facts at hand.
Rule 206, R.C.P., provides that in any case where the jury renders a general verdict, the court may require it also to "* * * find specially upon any particular questions of fact, to be stated to it in writing * * *. If both are harmonious, the court shall order the appropriate judgment. If the answers are consistent with each other, but any is inconsistent with the general verdict, the court may order judgment appropriate to the answers notwithstanding the verdict, or a new trial, or send the jury back for further deliberation. * * *" In addition to claimants' contention that there was no evidence of fraud which required jury submission, they argue that failure of the jury to so find unanimously sustained that contention. They advanced the same argument as to mental incompetency. We disagree. The mere fact that the jury did not agree as to these items unanimously does not generate a vital conflict with the general verdict. The jury did find there was undue influence exercised and that there was a lack of consideration for Exhibit P-1. These findings are sufficient to sustain the general verdict. The failure to agree unanimously as to the issues of fraud and mental incompetence is not an inconsistency, certainly not a vital inconsistency, with the general verdict.
It is well settled in this jurisdiction that all reasonable presumptions are in favor of the general verdict. Nothing is presumed in aid of the special findings. If the general verdict, thus aided, is not in irreconcilable conflict with the special finding, the former must stand. Fischer v. Hawkeye Stages, 240 Iowa 1203, 1206, 37 N.W.2d 284, and citations; Presthus v. Western Mutual Ins. Co., Iowa, 135 N.W.2d 549; 53 Am.Jur., Trial, § 1083. In Fishbaugh v. Spunaugle, 118 Iowa 337, 92 N.W. *550 58, this court discussed that question in a case involving a power to release a lien, and held where special findings are inconsistent with each other, or where there is apparent inconsistency between some of the special findings and the general verdict, yet if, considering all of the special findings, such inconsistency is not necessarily implied, the general verdict will stand.
Certainly the findings as to undue influence and lack of consideration are consistent with and support the general verdict. A finding was unnecessary that fraud and mental incompetence be also found. At most, we think the jury did not agree that the general verdict should be based on those grounds. However, those answers were not necessarily in conflict with the other findings, for mental weakness, which cannot be said to amount to mental incompetence, can and often does enter into the question of undue influence and fraud. The undue influence found here, although sufficient to void the instrument executed, could be less than fraud, and the jury understandably might hesitate to brand the acts complained of as fraudulent.
In addition to the evidence related in Division I on the issue of lack of consideration, we note that, except for the $8,400.00 claim of Lucille filed in the trust for services to Clara, there had been no expressed claims made by either Elmer or Lucille that Arthur and Clara owed them money. On the contrary, the admission of indebtedness of Elmer to Arthur was frequently expressed, with no claim of set-off or counterindebtedness. The jury could, we think, conclude, as it evidently did twice, that this claim of indebtedness was an afterthought to recoup moneys expanded by Elmer on the north farm which he expected to get by will, and for other personal expenditures while he was supposed to be a lessee of his father's lands. Few, if any, of the checks introduced in evidence in Exhibits D-5 to D-317 gave any indication that the expenditures were for Arthur and Clara's benefit.
We conclude the special findings were not irreconcilable with the general verdict and that there was no error in so holding.
V. In their concluding assignment complaint is made of the trial court's Instruction No. 6 and in its failure to give Requested Instruction No. 3. They claim the court erred in failing to sustain their motion for a new trial on that basis. We cannot agree. It is urged Instruction No. 6 was improper because it instructed the jury to determine whether a fiduciary relationship existed between Arthur and Clara, on one hand, and Elmer and Lucille on the other, at the time of the exercise of the claimed undue influence. Appellants maintain that issue was not raised in the pleadings and that any instruction on issues not pleaded was error. They cite Whitsett v. C., R.I. & P. Ry. Co., 67 Iowa 150, 25 N.W. 104, Ritter v. City of Fort Madison, 212 Iowa 564, 234 N.W. 814, Porter v. Decker, 222 Iowa 1109, 270 N.W. 897, and In re Estate of Klepper, 244 Iowa 521, 57 N.W.2d 565, in support of their proposition that it is reversible error to submit a fact question to the jury upon which there is no evidence. Generally-speaking, that is the rule. It is not applicable here, for there was no instruction given on fiduciary relationship. It was not defined for the jury and its legal effect was not related. On the other hand, matters were alleged which would give rise to the defense of mistake arising from the exercise of undue influence. The pleadings did not allege there was a fiduciary relationship, but they did allege circumstances which would indicate such a relationship could exist. An element involved in undue influence usually is the relationship of the parties. There was no claim that because of their association an extra duty or shift of burden was imposed upon the claimants, but we do not believe the instruction was so inappropriate as to require the granting of a new trial. As bearing on this question, see Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397; 36A C.J.S., p. 383.
*551 We are further satisfied that, taken in its entirety, there was no undue emphasis of the elements as to undue influence in Instruction No. 6, that except for the added recitation of appropriate elements, it was substantially the same as Requested Instruction No. 3, and no reversible error appears therein.
Perhaps the term "fiduciary relationship" was not the best to use here because of its legal connotations, but clearly the court was only telling the jury the elements they could consider in its determination of undue influence. As bearing on this question, see Groves v. Groves, 248 Iowa 682, 82 N.W. 2d 124. We do not find this assignment would justify ordering another new trial of this controversy.
Having found no reversible error, the verdict and judgment of the court upon the claim of appellants and the counterclaims of appellee is affirmed.
Affirmed.
All Justices concur.