# IN THE COURT OF APPEALS OF IOWA

No. 15-0446
Filed September 28, 2016

**HEARTLAND COOPERATIVE COMPANY,**
        Plaintiff-Appellee/Cross-Appellant,

vs.

**GERALD MURPHY,**
        Defendant-Appellant/Cross-Appellee
-----------------------------------------------------
**HEARTLAND COOPERATIVE COMPANY,**
        Plaintiff-Appellant,

vs.

**GARY FELL,**
        Defendant-Appellee.
_____

Appeal from the Iowa District Court for Guthrie County, Randy V. Hefner, Judge.

Gerald Murphy appeals the district court's judgment in favor of Heartland Cooperative Company (Heartland). Heartland challenges the district court's judgment in favor of Gary Fell. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Gina C. Badding of Neu, Minnich, Comito & Neu, P.C., Carroll, for Gerald Murphy and Gary Fell.

John F. Lorentzen of Nyemaster Goode, P.C., Des Moines, and Sarah J. Gayer of Nyemaster Goode, P.C., Cedar Rapids, for Heartland Cooperative Company.

Heard by Danilson, C.J., and Mullins and Bower, JJ.

**MULLINS, Judge.**

Gerald Murphy appeals the district court's judgment in favor of Heartland Cooperative Company (Heartland) on its breach-of-contract and fraudulent-misrepresentation claims. Heartland challenges the district court's judgment in favor of Gary Fell, alleging the district court abused its discretion by not entering default judgment against Fell as a discovery sanction. For the reasons stated herein, we affirm in part, reverse in part, and remand.

## I. Background Facts and Proceedings

At issue in this case are forty-one hedge-to-arrive (HTA) contracts, which the district court described as follows:

> A hedge-to-arrive contract, as pertinent to this case, obligates the seller to deliver a specified quantity of grain to a specified location by a particular date. The buyer agrees to pay a specific price for the grain upon delivery. Use of a hedge-to-arrive or cash-forward contract provides a [seller] an opportunity to establish a favorable sales price prior to harvest. The contract is a "hedge" because the [seller] possesses or reasonably anticipates possession of grain in sufficient quantities to deliver to the [buyer] at the delivery date. These types of contracts are not regulated by the Commodities Exchange Act, 7 U.S.C. section 1(a)(11).

Heartland, an Iowa cooperative, is in the business of buying and selling grain and offers HTA contracts. To minimize its risk, Heartland sells futures contracts on the Chicago Board of Trade (CBOT) to offset its obligation to buy the grain under the HTA contracts.

Of the forty-one contracts in dispute, thirty were originally entered into by Heartland and UY Partnership (UY) in 2009 and early 2010. Murphy, who has a degree in agricultural business and holds a patent he describes as involving a

"bundling strategy for financing, crop insurance, and commodity trading," was a general manager of UY.

The district court summarized the history of UY, which was formed in 2006, as follows:

> Fell farmed approximately 5500 acres in 2005. Murphy assisted him with marketing grain. At some point during this 2005 timeframe, Fell was investigated by the Farm Service Agency [(FSA)], which administers crop programs on behalf of the U.S. Department of Agriculture, for noncompliance with farm program requirements and was disqualified from receiving government farm program payments. In order to circumvent Fell's disqualification, Fell and Murphy approached [David Smith and Lynn Smith], who had worked for Fell, about forming UY Partnership. UY would not be eligible for farm program payments if Fell participated in its management. Thus, [Murphy] and the Smiths were reported as UY's general partners. . . . Operational control of the 5500 acres Fell had farmed, or a substantial portion thereof, was transferred to UY.

The district court found, based in part on the testimony of David Smith, that "Fell continued to participate in management of the UY farming operations." As a partner of UY, Murphy entered into a number of HTA contracts with Heartland, placing phone calls to Heartland to create the contracts.[1]

In late 2008, Murphy withdrew as a partner from UY, purportedly due to conflicts between the Smiths and Fell. Murphy testified he informed Heartland of his departure from the partnership in or before June 2009, which he contends is confirmed by Heartland's notation of "Don't Use" on its customer records for UY. However, a witness for Heartland testified Heartland was not notified until 2011,

---

[1] Murphy notes Heartland accepted his calls despite never having had UY execute a grain authorization form designating individuals authorized to enter into grain contracts on behalf of the partnership—as is Heartland's standard practice. Murphy further noted that, despite Heartland's claim it would send written confirmation of the calls in the mail, only two of the UY contracts at issue had actual, signed confirmations from UY.

testimony the district court deemed more credible. The district court also found Murphy continued to exercise control over UY's grain marketing even after his withdrawal, relying at least in part on certain HTA confirmation documents executed by Murphy on behalf of UY in 2009.

In 2009, FSA notified UY it was disqualified from future participation in the FSA programs and ordered repayment of certain monies already received because the FSA had determined UY and its members had "adopted and participated in a scheme and device that had the effect of evading the payment limitation and payment eligibility provisions for the 2007 crop year." By the spring of 2009, UY was defunct. The Smiths began farming through a partnership called UY09; Fell started producing grain under Fell Partnership; Murphy farmed through JM48 LLC. The above-referenced thirty HTA contracts executed with UY in 2009 and 2010 (the UY contracts) were formed after UY had stopped producing grain and after Murphy had withdrawn from UY.

The district court summarized the events after UY became defunct:

> Control of the 5500 Fell acres was transferred to these various entities prior to the 2009 crop year. The result was that UY was out of the grain farming business. Murphy continued to enter into HTA contracts for UY, even though he had dissociated from the partnership and even though UY was no longer producing grain. Fell partnership, UY09, and JM48 sold grain harvested from these farms to other elevators or merchants.

(Footnote omitted.)

Heartland became concerned about the HTA contracts in early 2010, at which point Heartland representatives met with Murphy. Murphy contended Heartland asked him to provide a successor entity to UY that could fulfill UY's contracts; Heartland argued, and the district court found, Murphy proposed rolling

the UY contracts into another name. Murphy executed a grain trade authorization form for Equity Control Group (ECG). All but three of the thirty UY contracts were rolled into contracts with ECG. Murphy also entered into eleven new HTA contracts on behalf of ECG in 2010 (the ECG contracts).[2]

At trial, Murphy testified Heartland was well-aware ECG was an entity "in name only," with no actual legal status and no ability to independently perform the contracts executed, relying in part on Heartland's failure to request a taxpayer identification number or other identifying information from ECG. The district court found Murphy's testimony not credible, concluding Heartland was never told ECG and Murphy were not in the farming business, did not produce grain, and had no means to fulfill the contracts.

During the summer of 2010, Heartland learned a bank had seized some of UY's grain.[3] At Murphy's request, the three outstanding UY contracts were rolled into 2011.

In 2011, Murphy requested all the existing contracts be rolled to a different date; Heartland refused when Murphy was unable to collateralize the contracts. In March 2011, Fell delivered beans to a Heartland facility. Heartland applied the proceeds to two of the UY contracts that had been transferred to ECG and issued contracts for the balance on the Fell Partnership account. Murphy testified Heartland did the same thing with grain delivered to one of its elevators by JM48, applying the proceeds to one of the ECG contracts. Murphy and Fell

---

[2] The thirty UY contracts and eleven ECG contracts are collectively referred to herein as the HTA contracts.

[3] Murphy claims that, by at least July 2009, Heartland was aware UY was in financial hardship, as it was instructed by the same bank to include the bank's name on all proceeds checks made to UY.

contended they stopped delivering grain to Heartland as a result. Heartland claimed Murphy and Fell sold their grain to other buyers who paid a substantially higher price than they would have received under the UY or ECG contracts.

In 2012, Heartland sold its futures positions on the CBOT with respect to the HTA contracts. Had Murphy and Fell disclosed in the spring of 2010 that UY and ECG could not deliver the contracted grain, Heartland could have liquidated its futures positions thereby minimizing or preventing its losses.

On April 24, 2012, Heartland filed its petition against Murphy and Fell, alleging they were personally liable for the breach of the HTA contracts and had tortiously interfered with the contracts. In their answer, Murphy and Fell denied Heartland's allegations and asserted a number of affirmative defenses. On September 19, 2014, Heartland sought leave to file an amended petition in which it asserted Murphy and Fell had intentionally interfered with the HTA contracts, had breached the contracts, and had committed fraud. The district court granted Heartland's motion to amend on October 20. In their answer, Murphy and Fell generally raised the same affirmative defenses.

The matter proceeded to a bench trial on November 18. On January 12, 2015, the district court entered its findings of fact, conclusions of law, and judgment, finding in favor of Heartland and against Murphy on the breach-of-contract and fraud claim and entering judgment against Murphy in the amount of $1,962,009.44 plus postjudgment interest. The court dismissed Heartland's claims against Fell and dismissed the intentional-interference-with-contract claim against Murphy. The court also found both Murphy and Fell guilty of two counts

of contempt of court for violating the court's discovery orders and ordered each defendant to pay $500 fines on each count.

In January 2015, Heartland filed a motion to retax costs and an attorney-fee application. Heartland also filed a motion to amend or enlarge judgment, seeking prejudgment interest. Murphy resisted the filings. Following a hearing, the district court entered an amended and substituted judgment, adjusting the judgment against Murphy to $2,217,608.20 to include prejudgment interest and awarding Heartland attorney fees in the amount of $215,761.27 plus interest. Murphy appeals the district court's judgment against him; Heartland appeals the district court's judgment in favor of Fell.

## II. Analysis

### A. Murphy Appeal

On appeal, Murphy challenges the district court's denial of his motion to dismiss and finding he breached the HTA contracts and committed fraudulent misrepresentation. Murphy also appeals the damages awarded. We address each claim in turn.

#### 1. Motion to Dismiss

On November 15, 2014, three days before trial was to commence, Murphy filed a motion to dismiss, alleging the district court lacked jurisdiction to hear the matter because the HTA contracts at issue are governed by the grain trade rules of the National Grain and Feed Association (NGFA), which require arbitration of disputes. Heartland resisted the motion, arguing, in relevant part, Murphy had waived his right to arbitration by actively participating in the litigation that, at the time Murphy filed his motion, had been ongoing for thirty-one months. On

November 18, 2014, the district court orally denied Murphy's motion "for the reasons stated in [Heartland's] resistance."

"We review a district court's ruling on a motion to dismiss for the correction of errors at law." *Iowa Individual Health Benefit Reins. Ass'n v. State Univ. of Iowa*, 876 N.W.2d 800, 804 (Iowa 2016) (citation omitted). "Our standard of review of rulings on subject matter jurisdiction is also for correction of errors at law." *Id.*

"The test for waiver of arbitration is twofold." *Pa. Life Ins. Co. v. Simoni*, 641 N.W.2d 807, 812 (Iowa 2002). "It requires 'conduct or activity inconsistent with the right to arbitration *and* prejudice to the party claiming waiver.'" *Id.* (citation omitted). "Factors relevant to an assessment of prejudice include the delay in the moving party's request for arbitration and the extent of the moving party's trial-oriented activity." *Wesley Ret. Servs., Inc. v. Hansen Lind Meyer, Inc.*, 594 N.W.2d 22, 30 (Iowa 1999). "Prejudice can be shown by 'lost evidence, duplication of efforts, or the use of discovery methods unavailable in arbitration.'" *Id.* (citation omitted). "Ordinarily, waiver is a fact question for the court to decide." *Simoni*, 641 N.W.2d at 813. "[E]vidence of waiver must be compelling . . . ." *Id.* (citation omitted).

Here, there is ample evidence Murphy engaged in conduct inconsistent with the right to arbitration to Heartland's prejudice. The lawsuit was pending thirty-one months before Murphy sought dismissal. During the pendency of the litigation, Murphy filed two answers (neither of which asserted a right to arbitration), a motion to change venue, and numerous filings on evidentiary matters and in preparation for trial. Murphy also sought and obtained two

continuances of the trial date and filed resistances to Heartland's motion to amend the petition and motions for sanctions. Murphy had also fully utilized the discovery process, having taken the depositions of Heartland employees and served interrogatives and requests for production. *See Campbell v. AG Finder Iowa Neb.*, No. 00-1630, 2002 WL 576160, at *2 (Iowa Ct. App. Feb. 20, 2002) (finding the parties seeking arbitration "frustrated the purpose behind arbitration by their long [twenty-month] delay in requesting arbitration and by taking full advantage of the litigation process"). We therefore affirm the district court's denial of Murphy's motion to dismiss.[4]

### 2. Breach of Contract

Murphy raises the following challenges to the district court's finding on Heartland's breach-of-contract claim: (1) the UY contracts transferred to ECG are void for lack of consideration; (2) the UY contracts transferred to ECG are void because Heartland fraudulently induced Murphy to execute the documents; (3) Murphy is not personally liable for the HTA contracts; and (4) Heartland failed to mitigate its damages. Heartland alleges Murphy failed to preserve error on certain of these claims and disputes each claim on the merits.

### a. Standard of Review

"The standard of review for a breach of contract action is for correction of errors at law." *Iowa Mortg. Ctr., L.L.C., v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013). "If substantial evidence in the record supports a district court's finding of

---

[4] On appeal, Murphy contends he did not assert a right to arbitration in his initial answer because he did not yet have a copy of the contracts. Murphy does not indicate when he first received the contracts; Heartland states it provided the contracts "early in the litigation." Regardless, in the motion to dismiss, Murphy did not rely upon any alleged late production of the contracts as a basis for his tardy invocation of his right to arbitrate.

fact, we are bound by its finding." *Id.* "However, a district court's conclusions of law or its application of legal principles do not bind us." *Id.*

### b. Consideration

Murphy contends the transfer of the contracts to ECG necessitated new or additional consideration. A claim of lack of consideration is an affirmative defense. *See In re Koch's Estates*, 142 N.W.2d 541, 544 (Iowa 1966); *Ins. Agents, Inc. v. Abel*, 338 N.W.2d 531, 534 (Iowa Ct. App. 1983). "Failure to plead an affirmative defense normally results in waiver of the defense, unless the issue is tried with the consent of the parties." *Dutcher v. Randall Foods*, 546 N.W.2d 889, 893 (Iowa 1996). Here, no dispute regarding the existence or sufficiency of consideration was tried by the parties. To the contrary, the district court found "[t]he parties do not dispute that the HTA contracts were valid" or "properly formed under common law principles." Murphy argues error was preserved because his answers to Heartland's petitions "dispute[d] whether there are any written contracts" and asserted "any such contracts . . . are contrary to law." The vague and solitary invocation that the contracts were "contrary to law" is not enough to preserve error on a claim for lack of consideration. Moreover, the district court never ruled upon this affirmative defense. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Error was not preserved.

### c. Fraudulent Inducement

Murphy next contends Heartland fraudulently induced him to enter into the contract on behalf ECG by demanding he provide a successor name for UY

without him realizing the change would make him liable on all the UY contracts. In its ruling, the district court concluded Murphy's allegations were "not supported by the evidence," finding "Murphy was a sophisticated business person and understood what he was doing." Further, the court concluded, based on the testimony of a Heartland representative, it was Murphy, not Heartland, who requested the UY contracts be transferred to ECG. The district court also credited the testimony of a Heartland representative as being more credible, finding it was not until 2011 that Heartland was informed Murphy had withdrawn from UY.

Substantial evidence supports these factual findings. *See Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) ("The district court has a better opportunity than we do to evaluate the credibility of witnesses. So we think factual disputes depending heavily on such credibility are best resolved by the district court."). As it was Murphy, not Heartland, who sought to transfer the contracts from UY to ECG, Murphy cannot be said to have been fraudulently induced into doing so. Murphy has failed to identify a misrepresentation or concealment by Heartland or his justifiable reliance on the same. *See Whalen v. Connelly*, 545 N.W.2d 284, 294 (Iowa 1996) (noting, to prove fraudulent inducement, the pleading party must demonstrate "by clear and convincing evidence: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage").

### d. Personal Liability

Murphy raises five objections to the district court's finding he was personally liable for the HTA contracts. First, Murphy disputes his liability for the

two contracts transferred to Fell Partnership. At oral arguments, Heartland conceded it is pursuing its claims as to these two contracts only against Fell, not Murphy. Accordingly, we vacate the district court's judgment as to those two contracts as applied to Murphy.

Murphy next argues he should not have been found liable for the three contracts that remained in UY's name because he had dissociated with UY and Heartland knew of the dissociation. But Murphy's contentions are premised upon factual allegations the district court explicitly rejected. The district court found Heartland was not informed of Murphy's departure from UY until 2011. In fact, two of the three contracts at issue, all of which were executed in 2009, were signed by Murphy. Even though Murphy dissociated from UY in 2008, he remained liable for the UY contracts because Heartland was unaware of this dissociation. *See* Iowa Code § 486A.703(2) ("A partner who dissociates without resulting in a dissolution and winding up of the partnership business is liable as a partner to the other party in a transaction entered into by the partnership . . . within two years after the partner's dissociation, only if . . . [t]he other party did not have notice of the partner's dissociation.").

Murphy also disputes the district court's finding ECG was a sole proprietorship or trade name of ECG, as no such trade name had been filed and ECG was not registered as a sole proprietorship. Regardless of the label applied to ECG by the district court, it is undisputed ECG is a nonexistent legal entity and Murphy entered into contracts with Heartland on ECG's behalf. Murphy "does not escape liability by purporting to act for a fictitious or non-existent [company]." *Alsco Iowa, Inc. v. Jackson*, 118 N.W.2d 565, 567 (Iowa 1962); *see also Allen v.*

*Pegram*, 16 Iowa 163, 170 (Iowa 1864) ("[W]here there is no principal who can be made legally responsible, the agent who undertakes to bind such a principal is individually liable.").

Next, Murphy alleges he cannot be found liable for the ECG contracts because he was merely functioning as a broker between Heartland and certain principals—such as UY09—under the NGFA grain trade rules. There is no indication the actual NGFA rule relied on by Murphy was raised before the district court. In its ruling, the district court noted, "Although [Murphy's] testimony is confusing and somewhat contradictory on this point, Murphy seems to claim that at least some of the ECG contracts were called in for other producers perhaps UY09." The district court went on to conclude, even in the event Murphy's allegations were true, Murphy remained liable on these contracts, citing the Restatement (Third) of Agency sections 6.02 and 6.03. Section 6.02 provides, in relevant part, "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of an unidentified principal, . . . the agent is a party to the contract." Restatement (Third) of Agency § 6.02. Section 6.03 provides, in relevant part, "[w]hen an agent acting with actual authority makes a contract on behalf of an undisclosed principal, . . . the agent . . . [is a] part[y] to the contract." *Id.* § 6.03. While Murphy denies making any calls on behalf of ECG, the district court found "Murphy entered into eleven other HTA contracts with Heartland for ECG," and there is no indication any other third-party was disclosed as the principal in these transactions. Murphy remains liable on these contracts.

Finally, Murphy claims the eight contracts are unenforceable under Iowa Code section 554.2201(1) (providing "a contract for the sale of goods for the

price of five hundred dollars or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought"). However, Murphy failed to raise the statute of frauds as an affirmative defense in his answer to Heartland's amended petition. *See Harriott v. Tronvold*, 671 N.W.2d 417, 422 (Iowa 2003) ("The statute [of frauds] provides a defense, and the party asserting it must therefore raise it by answer or by objection to evidence at trial."). Further, there is no indication the district court considered this claim. To the contrary, the district court explicitly held "[t]he parties do not dispute that the HTA contracts are valid" or "were properly formed." Error was not preserved.

We find substantial evidence supports the factual findings of the district court and it did not err in finding Murphy personally liable for the disputed contracts, with the exception of the two contracts transferred to Fell Partnership.[5]

### e. Mitigation of Damages

Finally, Murphy asserts the district court erred in finding he failed to show Heartland could have mitigated its losses.[6] An affirmative defense of failure to mitigate damages requires a defendant to show, by substantial evidence,

> (1) there was something the plaintiff could have done to mitigate [its] loss, (2) requiring the plaintiff to do so was reasonable under the circumstances, (3) the plaintiff acted unreasonably in failing to undertake the mitigating activity, and (4) a causal connection exists between the plaintiff's failure to mitigate and the damages claimed.

---

[5] Murphy disputes the district court's finding of his personal liability only as to sixteen of the HTA contracts: the eleven ECG contracts, the three UY contracts not transferred to ECG, and the two contracts transferred to Fell Partnership.

[6] Heartland contends Murphy failed to preserve error on this issue; however, the district court explicitly found "mitigation of damages was pled" but "Murphy and Fell presented no evidence supporting this affirmative defense." We therefore assume, without deciding, error was preserved.

*Vasconez v. Mills*, 651 N.W.2d 48, 53-54 (Iowa 2002).

In support of his affirmative defense, Murphy notes Heartland conceded it could have gotten out of its contracts without a loss in the spring of 2010 but failed to do so, despite knowing Murphy had left UY and UY was in financial difficulty. Again, Murphy's contentions are premised upon factual allegations the district court explicitly rejected. The district court found Heartland was not informed of Murphy's departure from UY until 2011. Heartland expressed concerns about the HTA contracts to Murphy in 2010, at which point Murphy— not Heartland—requested the UY contracts be transferred to ECG. Heartland relied upon Murphy's representations that grain would be produced by the entities with which Murphy was associated. Substantial evidence supports these factual findings. Accordingly, we affirm the finding of the district court.

### 3. Fraudulent Misrepresentation

Murphy raises the following challenges to the district court's finding on the fraudulent-misrepresentation claim: (1) there was no misrepresentation, (2) there was no intent to deceive, (3) Heartland lacks justifiable reliance, and (4) any alleged misrepresentations did not cause Heartland's damages. *See Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (listing the elements of fraudulent misrepresentation as "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage" (citation omitted)).

### a. Standard of Review

Our review of the judgment of the district court on Heartland's fraudulent-misrepresentation claim is for correction of errors at law. *See Chrysler Fin. Co.*

*v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005); *see also Martin v. Chemtech, Inc.*, No. 14-0230, 2015 WL 1332329, at *6 (Iowa Ct. App. Mar. 25, 2015) (reviewing findings from a bench trial on a fraudulent-misrepresentation claim).

### b. Misrepresentations

In its ruling, the district court identified the following misrepresentations: (1) Murphy represented, by signing the grain authorization marketing form, ECG was in the business of producing grain and (2) Murphy's implicit representation UY was actively engaged in grain production after 2009 and his failure to disclose he had dissociated from UY in 2008. Murphy disputes these findings.

As to the first misrepresentation, Murphy does not dispute he signed the grain authorization marketing form but rather the district court's interpretation of said form. Our review of the district court's interpretation of the contract is as a matter of law. *Longfellow v. Sayler*, 737 N.W.2d 148, 153 (Iowa 2007).

The form at issue contains two portions: the first identifying individuals authorized to enter into grain contracts on behalf of ECG and the second making representations to Heartland. In the former portion, it provides, "I the customer [ECG] hereby grant the following individuals authorization to enter into grain contracts on behalf of the account name and number stated above, including credit sale contracts and warehouse receipts." The form then identified and was signed by Fell, Murphy, and David Smith—through their respective companies— as authorized individuals.

Following these signatures, the latter part of the grain trade authorization form contained the following representation:

> **Contracting of Grain**: I represent to Heartland on behalf of the Customer [ECG] that: (1) we routinely sell grain to elevator[s]; (2) we have the particular skills and knowledge of grain trading practices that enable us to understand the terms of grain sale contracts enter[ed] into; (3) we are a merchant with respect to the sale of grain; (4) we understand that Heartland will rely on this representation as a condition for contracting; and ([5]) each of the individuals names above is authorized to enter into grain contracts with Heartland on our behalf. National Grain and [F]eed Association Rules apply to all contracts.

In addition to providing his signature identifying him as an individual authorized to contract on behalf of ECG, Murphy also signed the bottom of the form following this latter representations portion.

Murphy claims the form did not represent that ECG was in the business of producing and selling grain, but rather that the authorized individuals were in the business of producing and selling grain. On the face of the contract, this claim lacks merit. Regardless of what entities are also potentially part of the "we" referenced in the representations portion, the form clearly indicates the "Customer"—here, ECG—is "a merchant with respect to the sale of grain." *See generally Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) ("In interpreting contracts, we give effect to the language of the entire contract according to its commonly accepted and ordinary meaning."). It is undisputed by the parties that ECG was, in fact, not producing grain or otherwise engaged in the industry. Accordingly, we affirm the district court's ruling that this constituted a misrepresentation.

Murphy also challenges the district court's finding he misrepresented his status with UY to Heartland. First, as addressed above, substantial evidence supports the district court's finding that Murphy did not disclose to Heartland his

dissociation with UY until 2011. Following that time, Murphy entered into HTA contracts with Heartland on behalf of UY. He also worked with Heartland in 2010 to transfer the UY contracts to ECG. Even after 2010, Murphy sought to roll the remaining UY contracts to future dates, thereby representing UY's ability to perform those contracts in the future. Substantial evidence supports that, even after Murphy's departure from UY, he continued to present himself as a partner of a functioning UY.

### c. Intent to Deceive

Murphy next challenges the district court's finding he made misrepresentations with the intent to deceive. Specifically, he claims he only provided the name ECG at Heartland's request; providing ECG's name only converted already existing contracts—thus Heartland was not induced into HTA contracts by the representations made about ECG; and any representations made by Murphy about his intent to deliver grain in the future are not actionable because he had the intent to deliver at the time the statements were made.

As previously addressed, Murphy's first argument was dismissed by the district court, and substantial evidence supports the finding that it was Murphy, not Heartland, who sought transfer of the UY contracts to ECG. Ultimately, the district court found Murphy entered into the contracts—and sought to roll over the contracts—when fully aware he had withdrawn from UY and neither ECG nor UY were able to perform them. On this element, Murphy's claim on appeal fails.

### d. Justifiable Reliance

Murphy avers Heartland lacked justifiable reliance on any alleged misrepresentations made because it failed to ask for sufficient identifying

information from ECG—such as a tax identification number; no business entity designation was provided for ECG; Murphy provided no indication of the capacity in which he acted on behalf of ECG; and Heartland requested the entity change in the relevant UY contracts.

Reliance on a misrepresentation must be justified, not reasonable. *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009). "[T]he standard requires [parties] to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element has been met." *Id.* at 737.

The district court found, in addition to Murphy's degree and patent, that Murphy was a sophisticated grain marketer who was responsible for marketing grain for the entities involved, provided grain marketing advice to Fell, the Smiths, and others, and otherwise showed substantial marketing expertise. Substantial evidence supports these factual determinations. Heartland had been doing business with and through Murphy since 2006. *See id.* (considering "the existence of long-standing business or personal relationships"). The district court explicitly found Murphy did not inform Heartland of his 2008 departure from UY until 2011. *See id.* (considering "the concealment of the fraud" and the defrauded party's "opportunity to detect the fraud"). Heartland relied upon the explicit and implicit representations made by Murphy—about ECG, UY, and his continued association with UY—when agreeing to transfer the contracts to ECG, to roll over the contracts for UY, and to enter into new agreements with ECG. *See id.* (considering the plaintiff's "access to the relevant information," which party initiated the transaction, and the "generality or specificity of the

misrepresentations"). We find no legal error in the district court's determination Heartland justifiably relied upon Murphy's representations.

### e. Damages

Finally, Murphy contends the alleged misrepresentations did not cause Heartland's losses. *See id.* at 740 (noting damages is an essential element of fraud, which requires a finding that the misrepresentations "caused the losses in some way" and that the losses "result[ing] from the reliance were connected to the misrepresentation[s] in a way to which the law attaches legal significance").

The district court noted, "[Heartland's] claim for damages is based upon the losses it suffered in liquidating its CBOT contracts, which it foreseeably purchased to offset the UY and ECG contracts, plus interest on those losses," and concluded, "[t]hese damages were foreseeable and reasonably calculated."

All of the contracts at issue were entered into in or after 2009, *after* Murphy's dissociation with UY in 2008. Also *subsequent* to Murphy's dissociation with UY, thirty of those contracts were transferred to ECG and eleven originated with ECG in 2010. By originating and continuing those contracts, Murphy's misrepresentations "caused the losses in some way" and would not have happened "but for" Murphy's misrepresentations. *Id.* (applying the "but for" test of factual causation). Further, Murphy's misrepresentations, which induced Heartland to maintain or acquire CBOT futures, "increased the risk of harm." *Id.* at 741.

### 4. Interest Award

In its judgment, the district court awarded Heartland $1,962,009.44, the amount Heartland presented at trial as being its total losses. This calculation

included "interest expense," or the cost to Heartland of maintaining its positions on the CBOT. On appeal, Murphy contends the district court erred in including this "unspecified amount of interest in its compensatory damage judgment against Murphy." In its judgment, the district court noted, Murphy had not "argued that [Heartland's] calculation of damages is incorrect or applies a wrong measure of damages." At no time prior to appeal did Murphy dispute the damages calculations provided by Heartland during trial—including the "interest expense"—which were adopted by the district court and granted in its judgment. Error was not preserved on this issue.

Murphy next claims the district court erred in granting Heartland's motion to enlarge or amend because a reasonable controversy existed concerning Heartland's entitlement to recovery and the amount of that recovery, and thus the claim was unliquidated and prejudgment interest should not have been awarded. But Murphy did not raise the alleged unliquidated status of Heartland's damages in his resistance to the motion. Error was not preserved.

### B. Heartland Appeal

In the cross-appeal, Heartland contends the district court erred in denying its request for default judgment against Fell and Murphy as a sanction for discovery violations.

### 1. Discovery Process

This action was initiated in April 2012. On June 20, Heartland served its first set of interrogatories and requests for production of documents on Murphy and Fell. By September 11, Heartland had filed its first motion to compel based upon Murphy and Fell's failure to provide any response to its discovery requests.

The district court granted Heartland's motion to compel on October 1, giving Murphy and Fell until October 19 to produce the documents. Murphy and Fell then served some responses and produced a limited number of documents. In early 2014, Heartland served more discovery requests. Heartland contends no response was received. Murphy and Fell were then deposed on April 7, 2014. At these depositions, Murphy and Fell indicated they, or their agents, were in possession of numerous relevant documents that had not been produced. On May 9, Heartland served its third requests for production of documents on Fell and Murphy, seeking documents identified by them in their depositions.

On July 23, 2014, Heartland filed its second motion to compel discovery and subpoenaed documents. As the district court found following trial, Murphy and Fell "did not resist that motion, did not deny that the requested documents were in their possession, custody, or control, and did not deny that they had not produced those documents. They did not contend that the documents were not discoverable." However, in early August, Fell and Murphy produced additional documents to Heartland. On August 11, Heartland's second motion to compel was granted. In late August, Murphy and Fell produced additional documents with a letter that outlined some documents received by Murphy and Fell from Heartland, specified documents already produced that qualified as the documents being sought, and denied the existence or possession of other documents requested.

In early September, Heartland sent Fell a deficiency letter based on his production. By letter dated September 12, 2014, Fell responded to this deficiency letter, indicating some of the documents sought either were already

produced, were not in Fell's possession, or did not exist. On September 19, Heartland filed a motion for sanctions seeking default judgment against Murphy and Fell. Murphy and Fell summarily resisted. The district court denied Heartland's motion "at this time" but granted Heartland leave to renew its motion.

On November 11, Heartland renewed its request for sanctions, seeking default judgment against Murphy and Fell. Murphy and Fell summarily resisted the motion. On November 18, the date set for trial, the district court deferred ruling on Heartland's renewed motion for sanctions.

Following trial, in its judgment, the district court dismissed the claims brought against Fell, finding Fell was not a general partner of UY and never entered into contracts as ECG's agent. The court stated there was "no evidence" Fell exercised authority as an ECG agent, had ownership in ECG, had a legal relationship with ECG, made any false representations to UY, or conspired with Murphy to defraud Heartland.

The district court also found the case had been "plagued with discovery disputes" and "a review of the exhibits to the motion for sanctions establishe[d] a pattern of late, incomplete, and evasive discovery responses." The court concluded the "situation require[d] imposition of substantial sanctions." However, the district court found it was "too late to declare either Defendant to be in default," instead treating Murphy and Fell's discovery violations as contempt of court and imposing fines of $1000 to each as "the most appropriate remedy under these circumstances."

### 2. Standard of Review

We review Heartland's appeal of the sanctions imposed against Fell and Murphy for abuse of discretion. *See Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012) (applying an abuse-of-discretion standard when considering an appeal by the prevailing party that the sanctions were too low and made payable to the wrong entity); *see also Everly v. Knoxville Cmty. Sch. Dist.*, 774 N.W.2d 488, 492 (Iowa 2009). "An abuse of discretion occurs 'when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Rowedder*, 814 N.W.2d at 589 (citation omitted).[7]

### 3. Default Judgment Against Fell

Heartland claims the district court abused its discretion in determining it was "too late" to find Fell in default, because it failed to appropriately consider the options available. *See Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010) ("In determining whether the court has abused its discretion, we must determine whether the trial court appropriately considered the options available."). Heartland contends this constitutes an abuse of discretion because the determination it was "too late" for certain sanctions means the district court failed to exercise its discretion at all. *Id.* at 257 ("A court abuses its discretion when it

---

[7] Both Murphy and Fell dispute the means of review employed by Heartland, arguing the proper means to raise this challenge was by writ of certiorari. *See Everly*, 774 N.W.2d at 492 ("The proper means to review a district court's order imposing sanctions is by writ of certiorari."). Heartland contends it is not appealing the sanction imposed, but rather appealing the district court's denial of its request for default judgment as a sanction. Regardless of the proper means to raise this appeal, *see* Iowa R. App. P. 6.108 (noting, irrespective of how a case is initiated, the appellate court "shall proceed as though the proper form of review has been requested"), both parties agree the standard of review is for abuse of discretion. *Compare Everly*, 774 N.W.2d at 492 ("A district court's order imposing sanctions . . . is reviewable for an abuse of discretion."), *with Mathias v. Glandon*, 448 N.W.2d 443, 445 (Iowa 1989) (applying the abuse-of-discretion standard to an appeal of the court's denial of a request for sanctions).

fails to exercise any discretion." (citation omitted)). Heartland also alleges, in light of the district court's finding that Fell's conduct "requires imposition of substantial sanctions," a more severe sanction than the de minimis fine of $1000 was necessitated. Finally, Heartland contends the district court's abuse of discretion was prejudicial, because Heartland has presented enough evidence to justify more severe sanctions and the production of the discovery requested may well have altered the outcome of its case against Fell. *See Jones v. Univ. of Iowa*, 836 N.W.2d 127, 140 (Iowa 2013) (noting, when considering a district court's denial of a motion to compel discovery, "[i]t is well-settled that nonprejudicial error is never ground for reversal on appeal"). Heartland concludes the district court failed to impose the just sanctions required when it failed to grant default judgment.

"Dismissal and entry of a default judgment should be the rare judicial act." *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 241 (Iowa 1988) (citation omitted). "[B]efore the district court may dismiss an action for failure to comply with a discovery order there must be a finding that the failure to comply was a result of willfulness, fault, or bad faith." *Marovec v. PMX Indus.*, 693 N.W.2d 779, 786 (Iowa 2005). Heartland contends the district court found willfulness when it imposed a sanction based on contempt, *see Reis v. Iowa Dist. Ct.*, 787 N.W.2d 61, 68 (Iowa 2010) ("Resistance to or violation of an order cannot be considered contempt of court unless it is willful."), and that this finding is binding on appeal. While default may have been justified, "the sanction to result from noncompliance [with discovery] rests with the sound discretion of the trial court." *Whitley v. C.R. Pharm. Serv., Inc.*, 816 N.W.2d 378, 388 (Iowa 2012). The district court

considered the options available for the discovery abuses committed—including the default judgment Heartland requested—and determined fines for contempt were "the most appropriate remedy under these circumstances." We cannot find the district court abused its discretion in reaching this conclusion.

### 4. Default Judgment Against Murphy

Heartland requests, in the event this court finds in favor of Murphy on his appeal, that this court grant default judgment against him for the same reasons asserted against Fell. Because Murphy's claims have failed, we need not reach Heartland's alternative contention.

### C. Appellate Attorney Fees

On appeal, Heartland seeks an award of its appellate attorney fees. Murphy resists. "Generally, attorney fees are not allowable unless authorized by statute or contractual agreement." *FNBC Iowa, Inc. v. Jennessey Grp., L.L.C.*, 759 N.W.2d 808, 810 (Iowa Ct. App. 2008) (citing *W.P. Barber Lumber Co. v. Celania*, 674 N.W.2d 62, 66 (Iowa 2003)). However, courts are authorized "to award attorney fees in an action where 'judgment is recovered upon a written contract containing an agreement to pay an attorney's fee." *Id.* (quoting Iowa Code § 625.22). The HTA contracts provide: "In the case of either party's default of any of its obligations in this contract, he/she shall be liable to the other party for all costs incurred (including attorney fees) in the enforcing of this contract and/or collecting any damages found owing to the party not in default."

As the written contract contains a clear and express provision regarding attorney fees and litigation expenses, Heartland is entitled to attorney fees expended in defending against Murphy's appeal. We remand this issue to the

district court to make findings and conclusions regarding the appropriate amount of appellate attorney fees.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court in part, reverse in part, and remand for recalculation of the judgment in favor of Heartland against Murphy without the two Fell Partnership contracts and related interest and for calculation of appellate attorney fees.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**